AF Approval

Chief Approval

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 8:20-cr-196-T-33AAS

RICHARD EPSTEIN
a/k/a "Rick Epstein"

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Maria Chapa Lopez, United States Attorney for the Middle District of Florida, the Criminal Division, Fraud Section (hereinafter, the "Offices"), and the defendant, Richard Epstein a/k/a "Rick Epstein," and the attorney for the defendant, Frank A. Rubino, Esq., mutually agree as follows:

### A.   Particularized Terms

1.   Counts Pleading To

The defendant shall enter a plea of guilty to Count One of the Information. Count One charges the defendant with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

2.   Maximum Penalties

Count One carries a maximum sentence of 10 years' imprisonment, a fine of $250,000, a term of supervised release of not more than 3 years, and a special assessment of $100. With respect to certain offenses, the Court shall order the

Defendant's Initials _____

defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.   Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:   two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit health care fraud, as charged in the Information; and

Second:   the defendant knew the unlawful purpose of the plan and willfully joined in it.

4.   Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.   No Further Charges

If the Court accepts this plea agreement, the Offices agree not to charge defendant with committing any other federal criminal offenses known to the Offices at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

Defendant's Initials _____                    2

6.   Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to the Medicare Program, the Department of Veterans' Affairs, and any other victims as determined by the Court.

7.   Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

8.   Acceptance of Responsibility—Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not

Defendant's Initials _____    3

binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the Offices, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.     Cooperation—Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and

Defendant's Initials _____                          4

all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the Offices, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the Offices, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the Offices, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

10.   <u>Use of Information—Section 1B1.8</u>

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of

Defendant's Initials _____     5

defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

11. Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 982(a)(7), whether in the possession or control of the United States, the defendant or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $3,000,000 in proceeds the defendant admits he obtained, as the result of the commission of the offenses to which the defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant personally obtained this amount as a result of the commission of the offenses, and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offenses of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained

Defendant's Initials _____     6

from commission of the offenses and consents to the entry of the forfeiture order into the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the Offices to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the

Defendant's Initials _____      7

forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG §1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

Defendant's Initials _____                    8

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be

Defendant's Initials _____     9

binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.**    **Standard Terms and Conditions**

    1.    **Restitution, Special Assessment and Fine**

        The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offenses, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

        On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.

Defendant's Initials _____    10

The defendant understands that this agreement imposes no limitation as to fine.

2.    <u>Supervised Release</u>

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    <u>Immigration Consequences of Pleading Guilty</u>

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    <u>Sentencing Information</u>

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the counts to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any

Defendant's Initials _____      11

recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines,

Defendant's Initials _____        12

restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.   <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

Defendant's Initials _____

13

7.   <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.   <u>Scope of Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and the Criminal Division, Fraud Section, and cannot bind other federal, state, or local prosecuting authorities, although the Offices will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

Defendant's Initials _____    14

9.   Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.   Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's

Defendant's Initials _____           15

defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

### FACTS

*Overview*

Beginning in or around October 2016, and continuing through in or around April 2019, in the Middle District of Florida, and elsewhere, the defendant, RICHARD EPSTEIN ("EPSTEIN") knowingly and willfully conspired and

Defendant's Initials _____        16

agreed with others to defraud federal health care benefit programs and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by a health care benefit program, in connection with the delivery of and payment for health care benefit services.

*The Medicare Program*

The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part B" covered outpatient care and supplies. Outpatient care included, among other things, services provided by physicians, medical clinics, laboratories, and other qualified health care providers. The services included, for example, office visits, minor surgical procedures, and, pertinently, laboratory testing. Supplies included, among other items, "durable medical equipment" ("DME"), which included, pertinently, braces (*e.g.*, knee braces, back braces, shoulder braces, wrist braces, and other

Defendant's Initials _____    17

"off-the-shelf" braces). Medicare Part B covered the aforementioned items and services when they were medically necessary and ordered by licensed medical doctors or other qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, rather than through Medicare Part B.

Physicians, clinics, and other health care providers, including laboratories and DME suppliers (collectively, "providers") that provided supplies and/or services to beneficiaries were able to apply for and to obtain unique identification numbers allowing them to bill Medicare. Such unique identification numbers included, pertinently, (i) Medicare "provider numbers," and (iii) "Provider Transaction Access Numbers" ("PTANs"). Providers that received Medicare provider numbers and/or PTANs could file claims with Medicare to obtain reimbursement for medically necessary services or supplies provided to beneficiaries. To receive Medicare reimbursement, providers needed to have, among other things, applied to the Medicare Administrative Contractor ("MAC") and executed written provider agreements and related documentation.

Under Medicare Part B, claims for services (including laboratory testing) and DME supplies were adjudicated and processed through MACs, which were statutory agents of CMS. The MACs processed claims based on their assigned

Defendant's Initials _/__/_          18

geographical area or "jurisdiction." For laboratory testing and other services, Novitas Solutions Inc. ("Novitas") was the MAC assigned to consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania. For DME supplies, Medicare Part B claims were processed by the MACs known as CGS Administrators, LLC ("CGS") and Noridian Healthcare Solutions ("Noridian"). Together, CGS and Noridian are referred to as the "DME MACs." For claims submitted under the Medicare Advantage Program, private health insurance companies, through their respective Medicare Advantage Plans, adjudicated claims in locations throughout the United States.

### Cancer Genetic Testing

Cancer genetic testing ("CGx testing") used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. The test was typically performed on DNA material obtained from a patient who provided a simple cheek swab.

CGx testing was not a method of diagnosing whether an individual had cancer at the time of the test. Medicare did not cover diagnostic testing that was not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. Except for certain statutory exceptions, Medicare did not cover examinations performed for a

Defendant's Initials _____

19

purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury.

If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Specifically, all diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests were required to be ordered by the physician who was treating the beneficiary, that is, the physician who furnished a consultation or treated a beneficiary for a specific medical problem and who used the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who was treating the beneficiary were not reasonable and necessary.

*DME Claims under Medicare Part B*

DME, as previously noted, included, pertinently, knee braces, back braces, shoulder braces, wrist braces, and other "off-the-shelf" braces. Under Medicare Part B, claims for DME supplies could be submitted for payment to the DME MACs through system known as an "Electronic Data Interchange" ("EDI"), which allowed DME suppliers to transmit claims to Medicare electronically. To enroll in electronic claims submissions, Medicare required that DME suppliers complete a Common Electronic Data Interchange ("CEDI") agreement with the DME MACs. The CEDI agreement required DME suppliers to agree to several

Defendant's Initials _____   20

terms and conditions, including, for example, that it will submit claims that are accurate, complete, and truthful. They also had to agree that, because all claims would be paid from federal funds, anyone who misrepresented or falsified any record or other information relating to any submitted claims could be subject to a fine and/or imprisonment under applicable Federal law.

To submit DME claims to Medicare, the DME supplier needed to report: (a) the type of service provided using a "Healthcare Common Procedure Coding System" or "HCPCS" code; (b) the date of service or supply; (c) the referring physician's NPI; (d) the charge for such services; (e) patient's diagnosis; (f) the NPI and PTAN for the DME supplier seeking reimbursement; and (g) certification that the supplies were medically necessary. The DME supplier also need certain information on file, including: (a) written documentation of a verbal order or a preliminary written order from a treating physician; (b) a detailed written order from the treating physician; (c) information from the treating physician concerning the beneficiary's diagnosis; and (d) proof of delivery of the orthotic brace to the beneficiary.

*Reliance on Telemedicine*

Telemedicine was a means of connecting patients to providers via a telecommunication technology, such as video-conferencing. Telemedicine companies hired physicians and other providers to furnish telemedicine services

Defendant's Initials _____     21

to individuals. Telemedicine companies typically paid "treating providers" a fee to consult with patients. In order to generate revenue, telemedicine companies typically either billed the Medicare program or other health insurance program, or offered a membership program to patients.

Some telemedicine companies offered membership programs to patients who signed a contract for telemedicine services, paid a set dollar amount per month, and paid a fee each time the patient had a telemedicine encounter with one of its providers.

Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included, among others: (a) that the beneficiary was typically located in a rural area (meaning, outside a "Metropolitan Statistical Area" or in a rural health professional shortage area); (b) that the services were delivered via an interactive audio- and video-telecommunications system; and (c) that the beneficiary was at a practitioner's office or a specified medical facility—not at home—during the telehealth service furnished by a remote practitioner.

*Overview regarding CHAMPVA*

The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health benefit program. CHAMPVA is a comprehensive health care program in which the VA shares the cost of covered

Defendant's Initials _____

22

health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability. In general, the CHAMPVA program covers most health care services and supplies that are medically and psychologically necessary. CHAMPVA was always the secondary payer to Medicare and reimbursed beneficiaries for costs that Medicare did not cover. Health care claims must have first been sent to Medicare for processing. Medicare electronically forwarded claims to CHAMPVA after Medicare had processed them. For Medicare supplemental plans, CHAMPVA processed the remaining portion of the claim after receiving Medicare's explanation of benefits.

### The Scheme

Between in or about October 2016 through in or about April 2019, EPSTEIN and his partner, M.N., ran a telemarketing operation—REMN Management, LLC ("REMN")—that initially targeted the Medicare-aged population to generate orders for DME and, later, CGx-testing. EPSTEIN and M.N. are sometimes referred to herein as the "REMN Conspirators." EPSTEIN and M.N. then bribed medical practitioners to sign and to approve the orders, regardless of their medical necessity. Some of these practitioners, particularly in

Defendant's Initials _____   23

or after April 2018, were associated with EPSTEIN and M.N.'s own fraudulent "telemedicine" company known as Comprehensive Telcare, LLC ("CompTel"). Through their telemarketing and telemedicine operations, EPSTEIN and M.N. facilitated the submission of approximately $134 million in fraudulent claims to Medicare and other federal health benefit programs, resulting in approximately $29 million in payments.

*Operations at REMN and CompTel*

Beginning in or about October 2016, EPSTEIN and M.N. formed REMN, a purported "telemarketing" company located in Tampa, Florida. REMN's purported "telemarketing" offerings served the DME and CGx-testing industries. But REMN was not actually engaged in legitimate "marketing" activity. Rather, REMN illegally sold and arranged for the sale of DME and CGx orders that were signed as a result of EPSTEIN and M.N. bribing medical practitioners. These orders were sometimes called "completed doctors' orders" because they included all of the components necessary to present the claims to Medicare or other federal health benefit programs for payment. Critically, those components included a medical practitioner's signature, which was typically procured under the guise of "telemedicine."

The critical need for medical practitioners' approval of such orders prompted the REMN Conspirators to form their own "telemedicine" company.

Defendant's Initials _____   24

In or about April 2018, they formed CompTel to obtain approvals for CGx tests and DME from their own stable of medical practitioners. CompTel was integrated into REMN's telemarketing operation, which reduced or eliminated reliance on third-party "telemedicine" (which was generally more expensive). The REMN Conspirators electronically delivered DME and CGx orders to CompTel's medical practitioners for review and approval. The REMN Conspirators paid CompTel's medical practitioners approximately $50 for each order they reviewed. It was clear, however, that CompTel's medical practitioners were not conducting compliant telehealth interactions. CompTel's medical practitioners typically had no prior treating relationship with the beneficiaries and, critically, often did not initiate a relationship or even contact with beneficiaries prior to approving DME and/or CGx orders. Instead, many medical practitioners at CompTel were "robo-signing" orders without evaluating medical necessity. For example, as EPSTEIN and M.N. knew, a CompTel physician named Dr. Daniel Canchola routinely approved CGx or DME orders within seconds of electronically accessing the requisition form online. Dr. Canchola's approval rate made it impossible for him to have contact—let alone a compliant telehealth interaction—with beneficiaries. Further, as EPSTEIN and M.N. were aware, CompTel practitioners did not bill Medicare or other federal health benefit programs for their purported consultation time. By forming CompTel, the REMN

Defendant's Initials _____     25

Conspirators had access to their own medical staff to bribe and to sign orders generated through their telemarketing operation; the orders were, in turn, illegally sold to third parties to submit to Medicare and other federal health benefit programs. The REMN Conspirators, however, also offered and sold CompTel's "telemedicine" services to other purported "marketing" companies, including Global One Medical Solutions LLC and Med-Connect USA LLC (together, "Global One/Med-Connect"), which conspirators Patsy Truglia and Ruth Fernandez operated, controlled, and/or managed.

### Illegal DME Claims

REMN generated numerous DME claims, which the REMN Conspirators sold to third-party, DME-front owners to submit to Medicare. The REMN Conspirators also offered and sold CompTel's fraudulent "telemedicine" services to DME-front owners and "marketers," including Truglia and Fernandez, to complete their orders for DME, regardless of medical necessity.

To generate DME claims, the REMN Conspirators acquired or purchased patient data or "leads" for Medicare beneficiaries. The REMN Conspirators fed this information to third-party call centers, some of which were overseas, to contact beneficiaries to offer DME and other items/services, including eventually CGx-testing (as detailed later). Requisition forms or orders were electronically created by the call centers, which the REMN Conspirators, in turn, transmitted to

Defendant's Initials _____ 26

medical practitioners. The medical practitioners were initially associated with third-party companies, including, as detailed later, Company A. To reduce reliance on third-party "telemedicine," which was more expensive, the REMN Conspirators formed CompTel. It was apparent to the REMN Conspirators that the medical practitioners were routinely not contacting beneficiaries, let alone conducting compliant telehealth interactions. The REMN Conspirators bribed the medical practitioners, either directly or through intermediaries, to sign and to approve DME orders.

The REMN Conspirators sold the illegal DME claims to third-party front owners to submit to Medicare and other federal health benefit programs. The claims were sold on a per-brace basis, but these transactions were disguised as "marketing" and other services on invoices. REMN had many DME-front customers, including R.D., A.B., C.B., A.A., Truglia, Fernandez, and others.

The REMN Conspirators also offered and sold CompTel's "telemedicine" services to third parties, including Truglia and Fernandez who operated Global One/Med-Connect. Global One/Med-Connect was a telemarketing operation targeting the Medicare-aged population for DME. Global One/Med-Connect's call-center representatives generated orders for DME, which were in turn electronically transmitted to CompTel via an automated, cloud-based delivery system established by the REMN Conspirators. The orders would be assigned to

Defendant's Initials _____          27

medical practitioners, including, for example, Dr. Canchola, for review and approval. CompTel's medical practitioners, as noted previously, typically did not contact beneficiaries and, instead, illegally approved DME orders in exchange for a fee without properly evaluating medical necessity. After CompTel's medical practitioners signed the orders, they were electronically delivered back to Global One/Med-Connect. The REMN Conspirators charged Global One/Med-Connect approximately $90 per consultation, although that price was, at times, lower to sustain the customer relationship. Global One/Med-Connect made payments through a third-party intermediary, P.S.

Approximately $25 million of these illegal DME claims were submitted to Medicare by Truglia, Fernandez, and their conspirators, resulting in payments of approximately $10 million. Approximately $137,643 of the illegal DME claims were submitted to CHAMPVA, which is a federal health benefit program, resulting in payments of approximately $20,304.

In addition to creating and selling illegal DME claims, the REMN Conspirators also controlled, owned, held financial interests in, and/or managed multiple DME supply companies—or, rather, the DME Fronts—including, but not limited to SunRay Medical, Inc. (1265900690/7730250001), JAM Medical (1164990594/7730230001), and A Step Above Medical, Inc. ("A Step Above") (1891270526/7724560001). The REMN Conspirators fraudulently established the

Defendant's Initials _____   28

above-referenced fronts with the intent of using these fronts as conduits to submit illegal DME claims to Medicare and other federal health benefit programs.

*Illegal CGx Claims*

In or about August 2017, the REMN Conspirators became involved in CGx testing. As with DME, the REMN Conspirators purchased leads from third-party call centers. The leads consisted of information about Medicare beneficiaries who had expressed an interest in CGx testing after responding to telemarketing campaigns, internet solicitations, and other forms of marketing. EPSTEIN drafted and provided scripts for call centers, which generally did not employ medical professionals, to use in soliciting Medicare beneficiaries to take CGx tests.

After obtaining the leads, REMN staff, at EPSTEIN and M.N.'s direction, contacted beneficiaries by telephone to confirm their interest in taking a CGx test and to explain the process, in order to increase the likelihood that the beneficiary would supply a cheek swab and sign a consent form authorizing the test. REMN staff also verified the beneficiary's Medicare coverage information to ensure that the test could be billed to Medicare. If a beneficiary agreed to take a CGx test, REMN staff, at EPSTEIN and M.N.'s direction, shipped a swab kit and a requisition to the beneficiary from its office in Tampa. Requisitions were preprinted forms specifying the available types of CGx tests (*i.e.*, testing a full

Defendant's Initials _____    29

panel of genes for multiple cancers, or testing only a limited panel for a smaller set of cancers), and identifying the laboratory that would perform the test. Beneficiaries were asked to sign the requisition forms to indicate their consent to having a CGx test performed, and to return the swab and the requisition form to REMN.

EPSTEIN and M.N caused the requisitions to be loaded to an electronic platform for telemedicine practitioners to review and sign. Initially, EPSTEIN and M.N. used Lotus Health for physician approvals of CGx requisitions. Beginning in or about April 2018, EPSTEIN and M.N. primarily used physicians associated with CompTel.

EPSTEIN drafted a "letter of medical necessity" for the telemedicine physicians to electronically sign with each CGx requisition. Once the requisitions and letters of medical necessity were signed, EPSTEIN arranged to have them transmitted to marketers, including Mark Allen, who had relationships with laboratories where the tests could be performed, or to the laboratories themselves.

As EPSTEIN and M.N. knew, Allen arranged for CGx orders to be tested and billed to Medicare. Initially, tests were referred to laboratories owned and/or controlled by Khalid Satary in the Atlanta, Georgia area in exchange for kickbacks paid out of the Medicare reimbursements. In or around February 2018, Allen began referring CGx tests to Acadian Diagnostic Laboratories, LLC

Defendant's Initials _____   30

("Acadian") in Baton Rouge, and to Laboratory A. EPSTEIN and M.N. knew that all the referrals were for CGx testing that was medically unnecessary and not reimbursable by Medicare because, among other things, the telemedicine physicians were not treating the beneficiaries for cancer or symptoms of cancer and did not use the results of the testing in any treatment of the beneficiaries. Acadian and Laboratory A referred the CGx tests to other testing laboratories to be performed, and then submitted claims for reimbursement to Medicare. In return for his referral of CGx tests to Acadian and Laboratory A, Allen received kickbacks paid out of the Medicare reimbursements, a portion of which he transferred to REMN and to JL Management, LLC d/b/a JL Billing ("JL"), a Wyoming company controlled by Allen and EPSTEIN. EPSTEIN transferred a portion of the funds received by REMN to telemedicine physicians and call centers.

From in or about January 2018, and continuing through in or about April 2019, EPSTEIN, M.N., and others submitted and caused the submission of approximately $109 million in fraudulent claims to Medicare and Medicare Advantage Plans, through Acadian and Laboratory A, for CGx testing that was not ordered by a treating physician, was not medically necessary, and was not reimbursable by Medicare. These claims resulted in approximately $19 million in payments.

Defendant's Initials _____        31

*Obstruction of Justice*

As acknowledged in law-enforcement interviews, beginning in or about April 2019, and continuing through at least May 2019, in the Middle District of Florida and elsewhere, conspirator Patsy Truglia and others directed EPSTEIN and P.S. to obstruct a health care investigation related to the above-referenced DME scheme. On or about April 18, 2019, EPSTEIN met with the other conspirators, including Truglia, P.S., and others, in Florida. The purpose of the meeting was to discuss commands for records contained in grand jury subpoenas issued in connection with a federal health care investigation by the United States District Court for the Middle District of Florida (TPA-2017-3-GJ-33-CPT, Subpoena Nos. 2018R02574015–18 and 2018R02574073–75) (hereinafter, the "Grand Jury Subpoenas")). After the meeting, EPSTEIN and other conspirators created, or caused to be created, fake, backdated invoices and a fake, backdated "consulting" contract that Truglia and others would use to respond to the Grand Jury Subpoenas in the federal health care investigation. On or about the April 26, 2019, EPSTEIN mailed a thumb drive to conspirator P.S., who would in turn deliver, or cause the delivery of, the fake, backdated invoices and a fake, backdated "consulting" contract to Truglia for production to a Grand Jury located in the Middle District of Florida. Truglia and others did in fact produce,

Defendant's Initials _____   32

or caused the production of, these bogus records to law-enforcement officials and to the Grand Jury located in the Middle District of Florida.

12.   <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

Defendant's Initials _____                33

13.    Certification

The defendant and defendant's counsel certify that this plea

agreement has been read in its entirety by (or has been read to) the defendant and

that defendant fully understands its terms.

DATED this _7th_ day of ~~March~~ April 2020.

MARIA CHAPA LOPEZ
United States Attorney

Richard Epstein a/k/a "Rick Epstein"
Defendant

Kristen A. Fiore
Assistant United States Attorney

Frank A. Rubino, Esq.
Attorney for Defendant

for Jay G. Trezevant
Assistant United States Attorney
Chief, Economic Crimes Section

ROBERT ZINK
Chief, Fraud Section

ALLAN MEDINA
Deputy Chief, Health Care Fraud Unit

Gary A. Winters
Trial Attorney
Criminal Division, Fraud Section
U.S. Department Of Justice

34